UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **IFEANYI ORAMULU,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **C.A. No. H-08-00277** |
| | § | |
| **WASHINGTON MUTUAL BANK,** | § | |
| **Defendant.** | § | |
| | § | |

### MEMORANDUM AND ORDER

Pending before the Court are Defendant's Motion for Summary Judgment (Doc.
No. 16) and Motion to Strike Plaintiff's Inadmissible Summary Judgment Exhibits. (Doc.
No. 23.) For the following reasons, Defendant's Motion for Summary Judgment must be
granted in part and denied in part and Defendant's Motion to Strike must be granted in
part and denied in part.

## I.      BACKGROUND

Plaintiff Ifeanyi Oramulu is a black man from Nigeria.[1] After he attended college
in the mid-1990s in Nigeria, he moved to the United States in 1997; he became a
permanent resident of the United States in 2002. (Pl. Dep. 18:15-22, 13:16, 14:25-15:3,
Sept. 23, 2008.) In July 2002, he was hired by Washington Mutual Bank[2] in Houston,
Texas, as a Personal Financial Representative ("PFR"). (Pl. Am. Compl. ¶ 11.) He was
promoted to Senior PFR and, in 2004, he was transferred to the Company Financial
Center at 11220 Fondren Road, Houston, Texas, at the invitation of Erica Wade, the

---

[1] As this is a Motion to Dismiss, all the facts are construed in Plaintiff's favor, unless noted.
[2] On September 25, 2008, JPMorgan Chase Bank, N.A. acquired certain assets and liabilities of
Washington Mutual Bank from the Federal Deposit Insurance Corporation, as receiver and is now the
successor-in-interest for any liability arising from Plaintiff's claims against Defendant. (Doc. No. 16, Def.
Mtn., at 1 n.1.)

manager at the Fondren branch. (Pl. Dep. 43:24-44:12, 51:4-9; Erica Wade Dep. 12:5-21, Feb. 11, 2009.) In his role as Senior PFR, Plaintiff helped customers open new accounts, serviced those accounts, and helped with customer complaints. (Pl. Dep. 52:1-10; 56:14-25.) Wade considered Plaintiff a good worker who was very intelligent and had excellent customer service skills. (Wade Dep. 48:21-49:1.) Plaintiff received awards for high sales numbers, and, on the day of his termination, was awarded a television for his exemplary sales record.

### A. Investigation/Interrogation of Plaintiff

Debbie K. Smith, a regional manager for Defendant who oversaw several branches in the Houston, Texas area, learned that computers logged on to Plaintiff's User ID had been used repeatedly to process transactions that were found to be fraudulent. (Debbie K. Smith Decl., ¶ 3, Mar. 16, 2009, Doc. No. 16 Ex. D.)  Smith testifies via declaration that she does not recall learning that any other employee's User ID was used repeatedly to process fraudulent transactions. (*Id.*) Defendant began a fraud investigation. Robert Cherry, a branch manger at the Fondren branch, was eventually terminated and prosecuted for theft in Harris County. (Wade Dep. 28:4-9.) Plaintiff was never arrested or prosecuted, but he was terminated, allegedly for violating a security policy. Plaintiff contends, and no other witnesses controvert, that he was framed by Cherry.

On January 25, 2006, after the workday had begun, Wade asked Plaintiff to follow her to a partially glassed-in room at the Fondren branch where representatives from Washington Mutual Financial often sit. (Pl. Dep. 75:6-16; 77:5-16; 135:8-16.) Patrick Jude Griggs,[3] at that time a senior fraud investigator and physical security specialist working for Defendant, was in the room when Plaintiff arrived. (Pl. Dep.

---

[3] Griggs is 5'11" and weights between 175-85 pounds. (Patrick Jude Griggs Dep. 110:15-22, Mar. 6, 2009.)

135:19-21.) Griggs was performing the interview because Leslie Jordan, a corporate security specialist (or senior fraud investigator) in charge of the investigation, was late. (Griggs Dep. 113:14-24.) According to Plaintiff, Griggs informed him that he was going straight from the room to detention and that he had to "be here" that day. (Pl. Dep. 193:1-6.) Griggs allegedly told Plaintiff that he was going to suffer in prison and described how men are raped there. (Pl. Dep. 198:8-17.) Plaintiff contends that the interrogation lasted 8 hours.[4]

Plaintiff admits that Griggs never used physical force to detain him and never threatened to use physical force. Instead, Griggs said that the police were coming, accused him of theft, and told Plaintiff he could not leave the branch. (Pl. Dep. 194:3-12; 195:23-11; 197:20-198:16.) Plaintiff was never handcuffed and no one guarded the door. (Pl. Dep. 192:18-21, 201:6-10.) Plaintiff never asked to leave the room or to use the bathroom. (Pl. Dep. 199:8-17.) Several times, during the course of the interrogation with Defendant and the police, Plaintiff was instructed to leave the room, but to remain where the interrogators could see him. (Pl. Dep. 192:4-15.) People walked in and out of the interview room throughout the course of the day. (Pl. Dep. 143:1-2.)

Teresa Moreau,[5] another Defendant employee who was acting as a witness to Griggs' interrogation of Plaintiff, told Plaintiff that he could not use his phone to cancel an appointment he had with a client that day. (Pl. Dep. 166:4-11.) Griggs would not let Plaintiff go back to his desk. (Pl. Dep. 200:21.) Subsequently, the police arrived, questioned Plaintiff, and then left without arresting him. (Pl. Dep. 195:10-20.) After the police left, Griggs escorted Plaintiff outside and searched his car. (Pl. Dep. 155:25-

---

[4] Plaintiff refers to what Defendant calls an investigation or interview as an interrogation.
[5] Moreau is approximately 5'5" and weighs 165-70 pounds. (Griggs Dep. 1116:6-13.)

156:20.) Plaintiff had loaned his car to a friend for the day, and she was with the car at the Fondren branch when the car was searched, which was embarrassing to Plaintiff. (Pl. Dep. 156:11-20.) Griggs did not accuse Plaintiff of theft in front of his friend, but she asked Plaintiff if he had stolen something. (Pl. Dep. 156:11-20; 162:12-19.)

Griggs presents a slightly different account of the investigation/interrogation. He contends that he did not call the police, although someone must have because members of the police did arrive. (Griggs Dep. 71:9-13.) Griggs believes the police were called because of documents found in Plaintiff's desk, including a list of account numbers. (Griggs Dep. 89:22-90:15.) Griggs did not have a weapon during the interview, and the room where Griggs interviewed Plaintiff had no lock. (Griggs Dep. 116:24-117:5.) Griggs insists that he did not threaten Plaintiff and did not prevent him from eating lunch or going to the bathroom, and he contends that he did not accuse Plaintiff of stealing or theft. (Griggs Dep. 118:1-2; 118:6-10; 118:18-21.) Griggs denies detaining Plaintiff in the confines of the Fondren branch, telling him that he was under custody for theft, or informing Plaintiff that he was not allowed to leave the Fondren branch. (Griggs Dep. 121:4-17.) Griggs contends that the entire period from the beginning of the interview until Plaintiff was escorted out of the building was less than four hours. (Griggs Dep. 113:1-8.)

## B. Allegedly defamatory incidents

Plaintiff contends that several defamatory incidents occurred during the interview and afterwards. During the course of the interrogation, Moreau provided Griggs a photo. (Pl. Dep. 187:24-188:2.) While Moreau was still in the interview room, Griggs allegedly used the picture to accuse Plaintiff of stealing money from an ATM owned by Defendant

4

and of covering the ATM's camera with a handkerchief. (Pl. Dep. 151:19-153:12.) Jordan allegedly escorted Plaintiff around the branch in front of customers, which Plaintiff took as an accusation of theft, but Jordan did not explicitly use those words. (Pl. Dep. 82:12-15; 174:19-2.) In the days after Plaintiff's interview, a customer called Plaintiff and told him that she had heard that Plaintiff had stolen something and another customer told Plaintiff that he had heard that Plaintiff was investigated for theft. (Pl. Dep. 181:5-1.) Plaintiff met two men on the street; someone had told one of the men that Plaintiff was investigated for theft, and Wade allegedly told the other man that Plaintiff had gotten in trouble for something. (Pl. Dep. 213:2-21.)

### C. Plaintiff's Termination

Defendant has a policy that employees are not allowed to let others use their computer User IDs. Specifically, Defendant's "Responsibility Guidelines," signed by Plaintiff in 2003, hold an employee accountable for all activity associated with an employee's "operator ID number" ("User ID") and explain that a violation of security policies is grounds for termination. (Pl. Dep. 97:7-98:3, Pl. Dep. Ex. 5.) Similarly, Defendant has a "Working for WaMu" handbook, that Plaintiff signed and that requires employees to report any suspicion of attempts to breach security or security loopholes to a supervisor. (Pl. Dep. 92:3-6, Pl. Dep. Ex. 4.) Plaintiff admits that Defendant's policy prevents an employee from sharing his password. (Pl. Dep. 98:22-99:4.)

Contrary to these policies, branch manager Robert Cherry allegedly asked Plaintiff repeatedly to step aside from the computer onto which he was currently logged on so that Cherry could help one of Cherry's customers. (Pl. Dep. 96:5-25.) The day before Plaintiff was fired, Plaintiff allowed Cherry to use a computer while Plaintiff was

logged on under his own User ID. (Pl. Dep. 103:9-104:10.) That day, Cherry asked Plaintiff if he could use the computer to print out a checklist. (Pl. Dep. 103:9-104:10.) Cherry allegedly accused Plaintiff of insubordination before Plaintiff stood up to let Cherry use the computer. (*Id*; 251:2-9.) Plaintiff contends that he spoke with Wade concerning this incident. (Pl. Dep. 107:16-19.)

Plaintiff further contends that it was common practice for a manager to ask an employee to step aside so that the manager could help the employee with a customer transaction. (Pl. Dep. 95:5-21.) He avers that Wade, a non-Nigerian black woman, used his computer while he was logged on, that Cherry used most of the tellers' computers while they were logged on, and that Cherry "touched a lot" of others' computers while they were logged on, although none of them was fired. (Pl. Dep. 124:14-21, 238:18-239:19.) Plaintiff also contends that Cherry used Wade's computer for transactions, but she was not fired; Plaintiff admits, however, that he never saw Wade allow Cherry to use her computer while she was logged on. (Pl. Dep. 172:22-173:2; 265:21-25.) Plaintiff contends that Cherry used Tumini Umnkoro's computer to explain things to her while she was sitting there, but she was not fired; Umnkoro is allegedly a second-generation immigrant  to the United States. (Pl. Dep. 317:7-25.) Plaintiff contends that Angela Martinez, a non-Nigerian, and another bank employee, performed a transaction for Cherry, but Plaintiff does not contend that Cherry used her computer while she was still logged on. (Pl. Dep. 271:15-25; 319:11-15.) Plaintiff does not know whether management was aware that Cherry was using other employees' computers with their

knowledge. (Pl. Dep. 271:2-14.) Wade allegedly posted by the bank's vault area a photograph of a wanted individual with the caption "the Nigerian."[6] (Pl. Dep. 312:7-11.)

Jordan briefed Smith on the results of the internal investigation and informed Smith that Plaintiff had violated security policies that require employees to keep their passwords and User IDs secure. (Smith Decl. ¶ 4.) Based on this information, Smith agreed that Plaintiff should be terminated. (*Id.*) Defendant, through Jordan and Griggs, fired Plaintiff on the day of the investigation. Griggs initially told Plaintiff that he was being fired for opening an account by telephone and Jordan immediately corrected Griggs by informing Plaintiff that he was fired for admitting that he violated security procedures. (Pl. Dep. 133:2-14; 220:16-221:16.)

Plaintiff insists that, because Defendant tracks employees' key strokes and keeps security videos, Defendant's employees could have established that Cherry was conducting the fraudulent transactions using Plaintiff's User ID prior to Plaintiff's investigation such that Plaintiff could have been spared the humiliating investigation. (Pl. Dep. 238:18-239:7.) Plaintiff claims that he was subjected to discrimination based on his race, color, and national origin. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights, received his right to sue letter, and filed this action within 90 days of the letter's receipt. Plaintiff now brings claims for race, color, and national origin discrimination under Chapter 21 of the Texas Labor Code, false imprisonment, libel, negligent hiring, supervision, training and retention, and slander. Plaintiff seeks actual and exemplary

---

[6] Plaintiff attaches to his Response a poster that includes photograph of a black man. This poster does not include the words "the Nigerian." (Pl. Resp., Ex. 7.)

damages, litigation fees and costs. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II. SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts." (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. RACE, COLOR, AND NATIONAL ORIGIN CLAIMS

### A. Standard

Plaintiff's Texas employment discrimination claims may be analyzed together with his Title VII claims.[7] *See, e.g., McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 461 (5th Cir. 2005); *Wallace v. Methodist Hosp. System*, 271 F.3d 212, 219 n.10 (5th Cir. 2001). Likewise, race discrimination claim brought pursuant to Section 1981 are governed by the same evidentiary framework applicable to Title VII employment discrimination claims. *See Pegram v. Honeywell*, 361 F.3d 272, 281 n.7 (5th Cir. 2004). "Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996). Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993); *Reeves*, 530 U.S. at 141. Title VII race, color, and national origin discrimination claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> *McDonnell Douglas* instructs that the plaintiff must first establish a *prima facie* case of [race]. . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action. . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Bodenheimer v. PPG Industries, Inc.,* 5 F.3d 955, 957 (5th Cir. 1993); *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40 (5th Cir. 1996); *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). If the plaintiff can establish that defendant's

---

[7] Plaintiff's Complaint includes only Texas Labor Code claims, but Plaintiff discusses Title VII in his Response to Defendant's Motion to Dismiss.

articulated reason is pretext, and if the *prima facie* case is sufficiently strong, a trier of fact may be able to conclude that, without additional evidence, the employer unlawfully discriminated. *See Reeves*, 530 U.S. at 148 (finding that the district court properly submitted the case to the jury). The plaintiff may also show that the defendant's articulated reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ("mixed motive alternative"). *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (holding that a Title VII plaintiff need not proffer direct evidence of discrimination to pursue a mixed-motives analysis); *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). If a plaintiff shows that discrimination was a motivating factor in a mixed-motives case, defendant must then respond with evidence that the same employment decision would have been made regardless of discriminatory motivation. *Rachid*, 376 F.3d at 312 n.8 (citing 42 U.S.C. § 2000e-2(m)). The employer's final burden "is effectively that of proving an affirmative defense." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005).

To establish an inference of intentional discrimination, a plaintiff must present a prima facie case by showing: (i) he belonged to the protected class (of Nigerian descent, black); (ii) he was otherwise qualified for his position; (iii) he was discharged or suffered some adverse employment action by the employer; and (iv) he was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. *St. Mary's Honor Center*, 509 U.S. at 506; *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004). A plaintiff can fulfill the fourth element if he

proves that he suffered an adverse employment action under circumstances in which an employee of a different race would not have suffered that action, irrespective of the race of his eventual replacement, if there is one. *See, e.g., EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340-341 (1982).

If the defendant meets its burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens" disappears, and "the sole remaining issue" is "'discrimination vel non.'" *Reeves*, 530 U.S. at 142-43 (citing *St. Mary's Honor Center*, 509 U.S. at 510)). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To satisfy that burden, the plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (citing *Burdine*, 450 U.S. at 256); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *see also Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (finding that an employer's inconsistent explanations for its employment decisions at different times may permit a jury to infer that the proffered reasons are pretextual).

Importantly, "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom' . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (citing *St. Mary's Honor Center*, 509 U.S. at 510; *Burdine*, 450 U.S. at 255, n. 10). On the other hand, even if the plaintiff presents some evidence that the

defendant's legitimate non-discriminatory reason is false or a pretext, "such a showing will not always be enough to prevent summary judgment, because there will be cases where a plaintiff has both established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, yet 'no rational factfinder could conclude that the action was discriminatory.'" *See Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (citing *Reeves*, 530 U.S. at 148). As the Supreme Court has explained, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*, 509 U.S at 511. In a case in which plaintiff shows a defendant's legitimate, non-discriminatory reason is false, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Price*, 283 F.3d at 720 (citing *Reeves*, 530 U.S. at 148-49.); *see also Vadie v. Miss. State Univ.*, 218 F.3d 365, 374 n. 23 (5th Cir. 2000) (stating that a plaintiff can avoid summary judgment when the "evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [race] was a determinative factor in the actions of which the plaintiff complains").

### B. Analysis

Defendant claims that Plaintiff has not established a prima facie case because he offers no evidence that any other employees engaged in conduct nearly identical to his. Specifically, Defendant contends that Plaintiff offers no evidence that any other employees admitted that they knowingly let Cherry use their computer under their User

ID. Plaintiff responds that it was common knowledge of the management of the Fondren branch that management engaged the practice of using computers of lower level staff while the staff were still logged on, but does not provide specific examples. Plaintiff contends that it is inconceivable that investigators did not become aware of these widespread policy violations.[8]

Here, Plaintiff satisfies the first three elements of a prima facie case. He is black and from Nigeria, he was otherwise qualified to do his job, and he was terminated. Plaintiff, however, has not provided evidence that he satisfies the fourth element either by identifying a replacement outside his protected class or by establishing that similarly situated employees were treated differently than he.

Plaintiff does not contend that he was replaced by someone outside of his protected class. The similarly situated element of a prima facie case requires the plaintiff to demonstrate that the employer "gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (internal alterations and quotations omitted). *See also Berquist v. Washington Mutual Bank*, 500 F.3d 344, 353 (5th Cir. 2007); *Perez v. Texas Dept. of Criminal Justice, Institutional Div.*, 395 F.3d 206, 213 (5th Cir. 2004) (holding that it is not enough to

---

[8] Plaintiff avers that he visited a WAMU branch several months after his termination and has a receipt verifying that one employee performed two transactions under two log-in names, more evidence that similarly situated employees were disparately treated. Defendant contends that the exhibit of these receipts, Pl. Ex. 4, is inadmissible because the exhibit is unsworn, unauthenticated and/or hearsay. (Doc. No. 23, Def. Mot. Strike.) Plaintiff does not provide an affidavit to authenticate the documents. *See* FED. R. EVID. 901. Unauthenticated documents are not competent summary judgment evidence. *Montes v. Ranson*, 219 Fed.Appx. 378, 380 (5th Cir. 2007) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Haynes v. Pennzoil Co.*, 141 F.3d 1163 (5th Cir. 1998)). Because the Court cannot rely on the exhibit's authenticity, or completeness, it will be stricken. Defendant's Motion, as to Exhibit 4, will be granted.

show that the employees' underlying misconduct is "comparably serious"). *See also,*
*Gates v. Lyondell Petrochemical Co.*, 227 Fed. Appx. 409, at *2 (5th Cir. 2007) (not
designated for publication) (in a work rule violation case, a plaintiff failed to establish a
prima face case when she demonstrated "neither that the management knew of those
other alleged falsifications, nor that other employees lied, as the plaintiff did").

While Plaintiff contends that violations of the security policy were widespread, he
presents no specific examples of other employees who admitted that they violated the
security policies. He insists that Wade allowed Cherry to use her computer under her log
in, but admits that he has no knowledge of this purported event.[9] He notes that in
Defendant's rebuttal to the EEOC, it does not deny that Cherry used a computer that
Wade was logged onto. Defendant, however, notes, in that letter, that Wade did not know
that her User ID was being used. Plaintiff does not controvert this statement. Plaintiff also
avers that Umnkoro allowed Cherry to use her computer to help her with her work, but
does not contend that Umnkoro knowingly allowed Cherry to use her computer, while
she was still logged on, to assist one of his own customers. The EEOC District Director,
in his Determination Letter,[10] relies on the allegedly different treatment of Cherry who,
even after it was suspected he had perpetrated illegal transactions, was not subject to
search or interrogation. (Letter of EEOC Supervisory Investigator, Nicholas Alwine, to
Ms. Kimberly Hale, EEO Consultant, Washington Mutual Bank, April 26, 2007.) As

---

[9] The EEOC District Director concluded that Plaintiff had presented sufficient evidence of discrimination
based on Plaintiff's national origin, in part, because, according to Plaintiff's statement Wade was suspected
of policy violations but not treated the same as he was. As discussed below, the EEOC did not have the
benefit of the deposition transcripts and other evidence presented to the Court in which Plaintiff specifically
admitted that he had no probative knowledge of the incidents involving Wade, and no other deponent
provided evidence sufficient to substantiate Plaintiff's speculation that Wade also admitted to allowing
Cherry to use her log in.

[10] The EEOC, after finding reasonable cause to believe that statutory violations had occurred, attempted to
conciliate the case with both parties. Its efforts were unsuccessful, the EEOC declined to bring suit against
Defendant, and the EEOC issued to Plaintiff a Notice of Right to Sue.

Defendant notes, however, employee searches or interrogations are not adverse employment actions that are actionable under Title VII (or by analogy, Texas Labor Code Chapter 21). *See, e.g., McCoy v. City of Shreveport*, 492 F.3d 551, 559-60 (5th Cir. 2007) (distinguishing the Supreme Court's abrogation of the "ultimate employment decision" standard in *Burlington Northern v. White*, 548 U.S. 53 (2006) as only applying to retaliation cases); *Cardenas-Garcia v. Texas Tech. University*, 118 Fed. Appx. 793, 793-94 (5th Cir. 2004) (not designated for publication) (explaining that disciplinary investigations and poor performance reviews are not ultimate employment decisions).

Given the strictures of the similarly situated analysis, the Court does not find that Plaintiff has presented any competent summary judgment evidence that Defendant treated a similarly situated employee, outside of Plaintiff's protected classes, differently.[11] Even if Umnkoro did allow Cherry to use her log in impermissibly, Plaintiff does not testify that management knew that. Smith, the regional manager in charge of making the decision to terminate Plaintiff, avers that she was unaware of any other employee who had admitted to violating a security policy by allowing a manger to use his User ID to complete transactions.[12] Similarly, Plaintiff admits that he has no knowledge that the

_____

[11] Plaintiff contends that he had no choice but to obey Cherry's request to use his computer because, otherwise, Plaintiff would have been fired for insubordination. Plaintiff asserts that a "Performance Improvement Notice" attached to his Response establishes that Wade disciplined him for informing her about Cherry's actions. (Pl. Resp. Ex. 6.) This Notice, issued by Cherry, describes an incident that occurred in March 2005 in which Cherry tried to coach Plaintiff about processing a wire and during which Plaintiff allegedly raised his voice. The Notice was not issued by Wade and does not discuss the incident Plaintiff claims it does. Plaintiff might argue that Cherry's actions constitute discrimination because, by singling out Plaintiff to perpetrate his fraud, Cherry effectively forced Plaintiff to violate a company policy, and that action lead to his termination. Plaintiff, however, contends that it was inconceivable that others were allowing coworkers to use their computers without logging out, and those people were not terminated. Consequently, under Plaintiff's averments, Cherry did not single him out for termination, even if Cherry had the authority to do so. This constructive termination argument, had it been made, would have failed.

[12] In the EEOC Letter of Determination, the District Director concluded that there was sufficient evidence of a prima facie case because Wade and Cherry were not similarly treated. In addition, the Director concluded "the Respondent's stated reason for the discharge of the Charging Party is deemed to be pretext in that the policy violation alluded to was based on information that was not available at the time of the

decision-makers in charge of his termination were aware of any other employees who allowed Cherry to use their computer while they were still logged on. (Pl. Dep. 271:2-14.) He provides no other evidence that Defendant had this knowledge. While Plaintiff contends that Defendant should have known of widespread violations of the security policy for which he was fired, unsupported speculation is not competent summary judgment evidence. *See, e.g., Arensdorf v. Paulson*, No. Civ. 06-3324, 2008 WL 4411597, 4 (S.D. Tex. Sept. 29, 2008), *aff'd sub nom. Arensdorf v. Geithner*, 2009 WL 1311511 (5th Cir. May 12, 2009). Plaintiff has not created a material fact issue such that the Court may deny Defendant's Motion for Summary Judgment as to Plaintiff's Chapter 21 claims.[13]

## IV. NEGLIGENT HIRING, SUPERVISION, TRAINING AND RETENTION

Defendant contends that Plaintiff's claims are barred by the Texas' Workers Compensation Act ("TWCA"), Texas Labor Code § 408.001. Plaintiff responds that the

---

Charging Party's discharge." Defendant moves to strike the letter because this last statement is based on a misstatement of fact and a misapplication of law because employee misconduct investigations and employee searches are not adverse employment actions. EEOC Letters of Determination are admissible under F.R.E. 803(8)(C) and probative of a claim of discrimination. *See DeCorte v. Jordan*, 497 F.3d 433, 440 (5th Cir. 2007). Their findings, however, are not dispositive in civil suits. *See, e.g. Price v. Federal Express Corp.*, 283 F.3d 715, 725 (5th Cir. 2002); *Price v. Rosiek Const. Co.*, 509 F.3d 704, 709 (5th Cir. 2007). Moreover, an EEOC determination alone is not sufficient to contradict a defendant's non-discriminatory reason for an adverse employment action. *See Mosley v. Marion County, Miss.*, 111 Fed. Appx. 726, at *2 (5th Cir. 2004). When the EEOC investigator has not conducted independent interviews and does not support his conclusion with admissible evidence, the letter may be properly excluded and, otherwise, an EEOC finding of discrimination does not necessarily create a material fact issue. *See, e.g., Septimus v. University of Houston*, 399 F.3d 601, 610 (5th Cir. 2005) (holding that an EEOC reasonable cause determination does not necessarily allow a plaintiff to proceed past the summary judgment stage). The Court, having concluded that the EEOC letter is untrustworthy and insufficient to create a material fact issue, will not rely on it in the instant order. Defendant's Motion to Strike as to the EEOC Letter will be denied as moot.

[13] Had Plaintiff established a prima facie case, Defendant responds with a non-discriminatory reason for his termination—that he violated a security policy. The only evidence Plaintiff presents that his national origin may have been a motivating factor in his termination is the contention that Wade posted a wanted poster identifying the suspect as "the Nigerian." To the extent this unsupported allegation is evidence of Wade's discriminatory animus against Nigerians, as noted above, Wade did not decide to terminate Plaintiff, she testified that she had no personal knowledge regarding the reasons for Plaintiff's discharge, and Smith described consulting Jordan, not Wade, while deciding to terminate Plaintiff.

so-called "personal animosity" exception, § 406.034(a), applies to except Plaintiff's claims from the TWCA.

The TWCA provides the exclusive remedy for injuries sustained by an employee in the course of his employment as a result of his employer's (or employer's agents', servants', and employees') negligence. *Ward v. Bechtel Corp.*, 102 F.3d 199, 203 (5th Cir. 1997); *Wingfoot Enterprises v. Alvarado*, 111 S.W.3d 134, 142 (Tex. 2003). The Texas Supreme Court has liberally construed § 401.011(26) to include emotional distress that includes "malfunctioning of the physical structure of the body." *GTE Sw. Inc. v. Bruce*, 998 S.W.2d 605, 609 (Tex. 1999); *Stewart v. Lexicon Genetics, Inc.*, 279 S.W.3d 364, 368 (Tex. App.—Beaumont 2009, pet. filed) (holding that, because they allege stomach problems and mild depression related to their mental and emotional injuries, the plaintiffs cannot avoid the exclusivity provisions of the TWCA for work-related injuries).

Under the "personal animosity" exception, some injuries are not compensable, including those that "arose out of an act of a third person intended to injure the employee because of a personal reason and not directed at the employee as an employee or because of the employment." Tex. Lab. Code § 406.034(a). The purpose of the exception is to exclude coverage for "those injuries from a dispute which has been transported into the place of employment from the injured employee's private or domestic life, at least where the animosity is not exacerbated by the employment." *Nasser v. Security Ins. Co.*, 724 S.W.2d 17, 19 (Tex. 1987). *See also Walls Regional Hosp. v. Bomar*, 9 S.W.3d 805, 807 (Tex. 1999) (holding that, when the defendant harassed the plaintiffs because they happened to be at work and plaintiffs did not contend that the defendant ever privately accosted them, the plaintiffs' claims were barred by the TWCA). Intentional conduct is

likewise not covered by the TWCA. *See, e.g., Walls Regional Hosp. v. Bomar*, 9 S.W.3d at 807.

Plaintiff does not contest that his employer is covered by workplace insurance. He alleges that he suffered injuries to his feelings, mental anguish, and similar wrongs because of these purported negligence claims. Plaintiff also contends that he suffered loss of earning capacity, although he admitted during his deposition that he is now employed and, in the year following the January 25, 2006, incident, he earned approximately what he did while working for Defendant. (Pl. Dep. 337:2-339:17.) Plaintiff's negligence claims are barred by the TWCA. *Ward v. Bechtel Corp.*, 102 F.3d at 203; *Harris v. Fresenius Medical Care*, C.A. No. 04-4807, 2006 WL 2065313, at *22 (S.D. Tex. July 24, 2006). The actions he complains of, to the extent they define a coherent claim, arose out of actions that took place at work, involving co-workers and supervisors, such that the personal animosity exception does not apply. *See, e.g. Bomar*, 9 S.W.3d at 807.

## V. DEFAMATION

Defendant contends that Plaintiff's claims are barred by the applicable statute of limitations. Plaintiff responds that the date of discovery is either the date that the plaintiff discovered the defamation occurred or the date that it started causing harm. Plaintiff contends that the date of discovery and injury was far less than a year from the date of filing.

In Texas, a plaintiff must bring any defamation claims no later than one year after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.002(a). The statute of limitations begins to run when the plaintiff has knowledge of the facts that constitute his claim. *See White v. Cole*, 880 S.W.2d 292, 294-95 (Tex. App.—Beaumont

1994, writ denied) (citing *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex. 1990)). The discovery rule tolls the statute of limitations "until a plaintiff discovers or, through the exercise of reasonable care and diligence, should discover the nature of the injury." *Newsom v. Brod*, 89 S.W.3d 732, 736 (Tex. App.—Houston [1 Dist.] 2002, no pet.) (internal citations omitted). *See also KPMG Peat Marwick v. Harrison County Housing Finance Corp.*, 988 S.W.2d 746, 749 (Tex. 1999). The discovery rule applies when the nature of the injury incurred is inherently undiscoverable and the evidence of the injury is objectively verifiable. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (quotations omitted).

Here, as described above, most of the allegedly defamatory statements were made within days of the late January 2006 investigation. Consequently, these statements are barred by the statute of limitations because Plaintiff did not file his action until more than a year had passed. Plaintiff claims that the discovery rule allows him to avoid the statute of limitations because a defamation action does not accrue until the defamatory statements start causing the plaintiff harm. Plaintiff recounts the mental trauma the event has caused him. The injurious effect of the defamatory statement is not the date on which the action accrued. As Plaintiff testified, he knew of the allegedly defamatory statements on the day of the investigation/interrogation and the days shortly thereafter. In his Complaint, Plaintiff alleges that his slander and libel claims are based on statements made on or about January 25, 2006. (Pl. Compl. ¶¶ 46, 31.)

Plaintiff also contends that he was approached by men on the street who reported that they had heard that he had been investigated for theft or asked him if he had stolen something. Plaintiff's evidence for this contention is a letter addressed to an EEOC

employee.[14] Likewise, in his Deposition, Plaintiff contends that two unidentified men he met on the street reported that they had heard that he had been investigated for theft or that he had gotten in trouble for something; one of them allegedly heard this statement from Wade.[15] Plaintiff does not identify the dates on which these statements were made, the people making them, and whether he has any basis for ascertaining that they heard what they said they heard. These insufficiently specific statements, that are hearsay, are insufficient to create a material fact issue of whether Defendant's employees impermissibly made defamatory statements within the statute of limitations period. Defendant's Motion, as to the defamation claims, will be granted.

## VI. FALSE IMPRISONMENT

Defendant contends that Plaintiff relies on unsworn, unauthenticated documents to support his false imprisonment claim. In addition, it argues that Plaintiff was not detained without his consent because Plaintiff was never physically restrained nor verbally threatened. In the alternative, Defendant contends that it was legally justified in detaining Plaintiff because he was suspected of perpetrating fraud on bank customers. Plaintiff responds that he was detained without his consent because Griggs threatened him with federal prison and told him to sit until the police arrived, and these threats overcame Plaintiff's free will to leave. In addition, Plaintiff contends that the interview, which he alleges lasted over eight hours, was unreasonably long. Lastly, Plaintiff insists

---

[14] Defendant contends that this letter should be struck because it is hearsay as an unsworn, unauthenticated, and not made the form of an affidavit. (Def. Mtn. Strike, at 3.) Defendant's motion, as to Exhibit 11, will be granted because Plaintiff's letter is unsworn, unauthenticated, and hearsay.

[15] Defendant also moves to strike the portions of Plaintiff's Deposition to which Plaintiff does not refer in his Response. The Court will exercise its discretion not to strike the Deposition excerpts but hopes that, in the future, Plaintiff will specifically cite the relevant portions rather than include the entire deposition. Defendant's Motion, as to the three included Depositions (Exhibits 1-3) will, therefore, be denied.

that Defendant was aware, or reasonably should have been aware that a manager could have assumed Plaintiff's identity and performed the acts of which Plaintiff was accused.

"The essential elements of false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law." *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002) (internal citations omitted). The first element is satisfied by conduct that is "intended to cause one to be detained and in fact causes the detention, even when the actor does not participate in the detention." *Id.* at 507. The detention may be accomplished by violence, by threats, or by any other means that restrain a person from moving from one place to another. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 645 (Tex. 1995) (citing *Martinez v. Goodyear Tire & Rubber Co.*, 651 S.W.2d 18, 20 (Tex. App.—San Antonio 1983, no writ)).

### 1. *Detention Without Consent*

In the case of an alleged detention by threat, "the plaintiff must demonstrate that the threat was such as would inspire in the threatened person a just fear of injury to her person, reputation, or property." *Johnson*, 891 S.W.2d at 645 (internal citations omitted). Threats to call the police and other threats of future action are not ordinarily sufficient, without more, to effect an unlawful imprisonment without contemporaneous events such as extended interrogation and intimidation. *Fojtik v. Charter Medical Corp.*, 985 S.W.2d 625, 629 (Tex. App.—Corpus Christi 1999, pet. denied) (internal citations omitted); *Morales v. Lee*, 668 S.W.2d 867, 869 (Tex. App.—San Antonio 1984, no writ). A court may examine the relative age, size, sex, and physical demeanor of the participants to determine whether such threats are sufficient to overcome the plaintiff's free will.

*Charter Medical Corp.*, 985 S.W.2d at 629; *Black v. Kroger Co.*, 527 S.W.2d 794, 800 (Tex. App.—Houston [1st Dist.] 1975, writ dism'd).

In other false imprisonment cases, courts have examined the timing of the interview, whether the plaintiff was prevented from leaving the area, whether the plaintiff was prevented from leaving when he made such a request, and whether he was told to remain in the interview area. *Compare, e.g. Safeway Stores, Inc. v. Amburn*, 388 S.W.2d 443, 446 (Tex. App.—Fort Worth 1965, no writ.) (holding that a 30 to 40 minute interview in a partially blocked hallway during which the plaintiff did not ask to leave nor was he told to remain did not constitute false imprisonment even though the interviewer intimidated plaintiff into signing a false confession), *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 645 (Tex. 1995) (holding that, even though the plaintiff believed that the interviewer, because of his sternness and his insistence that the plaintiff stay put, would physically prevent her from leaving, the plaintiff had no false imprisonment claim because she left the area twice, no one guarded her, and the interviewer never said that he would physically restrain her); *with Black v. Kroger Co.*, 527 S.W.2d at 801 (upholding the jury's verdict of false imprisonment when the plaintiff was intimidated because she had a "healthy respect for the authority" of the interviewer, the interviewer spoke in a loud voice, and the plaintiff was threatened with a long incarceration if she did not confess).

Here, Plaintiff was never handcuffed or told that he could not leave or eat his lunch. Plaintiff was not touched or threatened with a weapon. Griggs and Moreau do not have extremely large and imposing builds. Griggs left the interview room during the interview/interrogation, and Plaintiff was required to sit outside the interview room for

portions of the day. This case is factually similar to an unpublished decision issuing from

an appeals court in Corpus Christi. There, the court granted the defendant's motion for

summary judgment after concluding that the person interviewing her for regarding her

alleged theft:

> never physically touched her, physically threatened her, or restrained her
> from leaving the room. [The plaintiff] did not ask if she could call her
> parents. Although [the plaintiff] described [the interviewer's] manner as
> "rude," "abrupt," and "short," he remained "calm," and did not touch her,
> yell at her, call her a thief, call her bad names, or curse at her. Although he
> did not tell her she could leave, he never told her she could not leave.
> Lindsey was not in the room when Cuellar wrote her statement confessing
> to the "passing" of merchandise and "grazing."

*Cuellar v. Walgreens Co.* 2002 WL 471317, at *3-4 (Tex. App.—Corpus Christi 2002

no pet.) (unpublished). On the other hand, Plaintiff contends that he was held for 8 hours,

and that Griggs threatened that he would go to prison for a long time, someone working

for Defendant did call the police, Griggs accused him of theft, and Griggs would not

allow him to leave the bank branch.

The Court also notes that the instant facts bear some resemblance to *Johnson*

because Plaintiff left the area and his interviewer was allegedly stern. The Court,

however, ultimately finds *Johnson* and *Cuellar* distinguishable because Plaintiff avers

that he was confined to the bank branch for eight hours, that he was told to stay put

because the police were actually coming, and that he was threatened with prison rape. *See*

*Johnson*, 891 S.W.2d at 645 n.4 (explaining that temporarily restricting an employee's

movement may constitute willful detention if the employer uses physical force or

threatens the employee's person, reputation or property, citing *Black*). The Court finds

that, viewing the facts in the light most favorable to Plaintiff, he has testified to

circumstances that create a material fact issue over whether he was detained without his consent.

### 2. *Authority of Law*

In order to make out a claim for false imprisonment, the plaintiff must provide facts to prove that the detention was without the authority of law. In Texas, "[a] person who reasonably believes that another has stolen or is attempting to steal property is privileged to detain that person in a reasonable manner and for a reasonable time to investigate ownership of the property." TEX. CIV. PRAC. & REM. CODE § 124.001. "Reasonable cause for an investigative detention is something less than probable cause." *Wal-Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 520 (Tex. App.—San Antonio 1996, no writ). Reasonableness is examined based on the employee's actions under the circumstances and not on the actual guilt or innocence of the examined party. *Id.* at 520. Reasonableness is typically a jury question.

Although the shopkeeper's privilege does not always apply to employer-employee situations, in this case, Defendant was questioning Plaintiff about a fraud through which a bank employee had taken funds that belonged to a bank customer. The inquiry becomes, then, whether Defendant was reasonable in its belief and whether it detained plaintiff in a reasonable manner and for a reasonable time. Again, the Court finds that fact questions remain because of the length of the questioning and the manner in which the questioning was conducted. Defendant's Motion as to this claim will be denied.

### VII.   CONCLUSION

Defendant's Motion to Strike (Doc. No. 23) is hereby **GRANTED** as to Plaintiff's Exhibits 4, 11, **DENIED** as to Exhibits 1-3, and **DENIED AS MOOT** as to all

other Exhibits attached to Plaintiff's Response to Defendant's Motion for Summary Judgment. Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED** as to Plaintiff's Chapter 21, negligence, and defamation claims and **DENIED** as to his false imprisonment claim.

      **IT IS SO ORDERED**.

      **SIGNED** this *22nd* day of May, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE